UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
West Palm Beach Division

In re:                                          Case No. 11-36816-BKC-PGH

THOMAS F. KANE,                                 Chapter 7

      Debtor.

_____/

NICOLE TESTA MEHDIPOUR, Chapter 7      Adv. Case No. _____
Trustee for the bankruptcy estate of Thomas F.
Kane,

      Plaintiff,

v.

THOMAS F. KANE, JR. and AEGIS
INVESTMENT PARTNERS, LLC,

      Defendants.

_____/

**CHAPTER 7 TRUSTEE'S COMPLAINT FOR BREACH OF NOTE, NEGLIGENT
MISREPRESENTATION, FRAUDULENT MISREPRESENTATION,
UNJUST ENRICHMENT AND RECOVERY OF OTHER MONETARY DAMAGES**

      Plaintiff, Nicole Testa Mehdipour, Chapter 7 Trustee (the "Trustee" or the "Plaintiff"), of

the bankruptcy estate of Thomas F. Kane, Sr. (the "Debtor"), files this Complaint for Breach of

Note, Unjust Enrichment, Negligent Misrepresentation, Fraudulent Misrepresentation, and

Recovery of Other Monetary Damages (the "Complaint") against Defendants Thomas F. Kane,

Jr. ("Kane Jr.") and Aegis Investment Partners, LLC ("Aegis," and together with Kane Jr., the

"Defendants") and in support thereof, alleges as follows:

**FACTUAL ALLEGATIONS**

      1.      On September 28, 2011 (the "Petition Date"), the Debtor filed a voluntary petition

for relief under Chapter 7 of Title 11 of the United States Code.

2.      The Trustee is the duly appointed Chapter 7 Trustee of the Debtor's bankruptcy estate (the "Estate").

3.      Aegis is a Delaware limited liability company with its principal place of business located in Colorado.

4.      Kane Jr., the Debtor's son, is a resident of Colorado, and is otherwise *sui juris*.

5.      Upon information and belief, and at all material times, Kane Jr. is and continues to be the managing member of Aegis.

**A. The Manulife Loans**

6.      In 1995, the Debtor obtained loans from Manufacturers Life Insurance Company ("Manulife"), which loans were memorialized in a series of three promissory notes (the "Manulife Notes").  The Debtor's obligations under the Manulife Notes were secured by his 24% partnership interest in Adare Partners LP ("Adare").

7.      Kane Jr. was also a member of Adare.

8.      Upon information and belief, following the sale of substantial assets of Adare, Kane Jr. made repeated false representations to the Debtor and others that the Manulife Notes were fully satisfied and that Manulife provided a release of its security interest in the Debtor's partnership interest in Adare.

9.      Based upon Kane Jr.'s repeated false representations, the Debtor received monies from Adare that he would not have otherwise received and asserted that he was no longer obligated under the Manulife Notes.

10.      As a result, in December 2006, Manulife commenced litigation in Delaware Chancery Court (the "Manulife Litigation") against the Debtor and others seeking to collect in excess of $13 million under the Manulife Notes.

11.     The Debtor has had to incur significant legal fees and other expenses in the approximate amount of $1 million, due to the Manulife Litigation, which was still pending as of the Petition Date.

12.     Manulife has filed a proof of claim in the amount of $13,201,900.55 [POC #4] against the Debtor's bankruptcy estate based upon the Manulife Notes and the Manulife Litigation, which claim constitutes the vast majority of the Debtor's creditor body.

13.     Upon information and belief, but for the false representations made by Kane Jr., the Debtor would not have received the monies from Adare, may not be obligated under the Manulife Notes, and accordingly would not have incurred significant legal fees and expenses defending the Manulife Litigation.

**B. The Aegis Note**

14.     On or about July 1, 2003, Aegis issued the Debtor a Cash Flow Draw Note in the principal amount of $200,000 (the "Aegis Note").  A true and correct copy of the Aegis Note is attached hereto at **Exhibit "A**."

15.     The Aegis Note calls for the principal to be disbursed from the Debtor to Aegis in four payments.  *See* Aegis Note, § 2.

16.     The Debtor made the following four disbursements to Aegis under the Aegis Note: (i) $49,979 in May 2003; (ii) $99,979 in September 2003; (iii) $25,000 in November 2003; and (iv) $25,000 in December 2003 (the "Disbursements").  The Disbursements total $199,958.

17.     Aegis' repayment of the Aegis Note was to have commenced no later than January 1, 2004, from Distributable Cash[1] as it became available.  *See* Aegis Note, § 5.

---

[1] "Distributable Cash" is defined in Section 5 of the Aegis Note by reference to Section 1 of the Amended and Restated Operating Agreement of Aegis Investment Partners, LLC, as "all cash funds of the Company on hand from time to time (other than from Capital Contributions and from Carried Interest), after payment of or provision for the following: (a) all Company costs and expenses that are due and payable as of such time; (b) all Company costs and

18.     Daily compounding interest was to have accrued on the unpaid balance of the Aegis Note at a rate of 4%, equal to the prime rate as of July 1, 2003.  *See* Aegis Note, § 1.

19.     Any unpaid principal balance and accrued unpaid interest on the Aegis Note was to be due and payable on the third anniversary of the date of the Aegis Note, July 1, 2006 (the "Maturity Date").  *See* Aegis Note, § 5(iii).

20.     Failure of Aegis to make the full payment of all interest and principal due under the Aegis Note on the Maturity Date constitutes a default of the Aegis Note.  *See* Aegis Note, § 3.

21.     A default under the Aegis Note results in the entire unpaid principal balance of the Aegis Note becoming immediately due and payable.  *See* Aegis Note, § 3(a).

22.     To date, no portion of the Aegis Note has been repaid to the Debtor.

23.     On March 29, 2012, the Trustee sent Aegis a letter demanding repayment of the Aegis Note, plus accrued interest.  A true and correct copy of the March 29 demand letter is attached hereto as **Exhibit "B."**

24.     As of March 27, 2014, the total amount due and owing on the Aegis Note, including accrued interest, is at least $285,900.

25.     The Trustee has retained counsel and is obligated to pay her attorneys a reasonable fee for their services rendered.  The Aegis Note attached to this Complaint provides for payment of reasonable attorneys' fees, other expenses and court costs as to enforcement of the terms thereof.

---

expenses that are anticipated to become due and payable within ninety (90) days following the date on which Distributable Cash is being determined; and (c) such other liabilities and reasonable reserves of the Company as the Board of Directors determines are necessary or advisable."

## COUNT I
## BREACH OF THE NOTE
### (Against Aegis)

26.     The Trustee incorporates and realleges paragraphs 1 through 25 of this Complaint as is fully set forth herein.

27.     On or about July 1, 2003, Aegis and the Debtor executed the Aegis Note.

28.     The Debtor provided the Disbursements to Aegis pursuant to the Aegis Note.

29.     Aegis accepted and retained the Disbursements provided by the Debtor.

30.     Aegis was liable to repay the Disbursements, plus accrued interest, to the Debtor in accordance with the terms of the Aegis Note.

31.     Aegis failed to repay any portion of the Disbursements to the Debtor as of the Maturity Date.

32.     Accordingly, Aegis is in default under the Aegis Note.

33.     As of March 27, 2014, the total amount due and owing on the Aegis Note, including accrued interest, is at least $285,900.

WHEREFORE, the Trustee respectfully requests that this Court enter a judgment in her favor against Aegis for damages in the amount of $285,900, plus accruing interest, attorneys' fees and costs, and for such other and further relief as the Court deems just and proper.

## COUNT II
## UNJUST ENRICHMENT
### (Against Aegis)

34.     The Trustee incorporates and realleges paragraphs 1 through 25 of this Complaint as is fully set forth herein.

35.     Aegis received and retained the Disbursements from the Debtor and Aegis has failed to repay the Debtor.

36.    The Debtor conferred a benefit on Aegis

37.    A clear benefit has flowed to Aegis.

38.    Aegis either requested the benefit or knowingly and voluntarily accepted it.

39.    Under the circumstances, it would be inequitable for Aegis to retain such benefit without paying the value thereof.

40.    Aegis has been unjustly enriched by obtaining the Disbursements without repaying the Debtor.

41.    The Debtor has been damaged by the actions of Aegis in the amount of the Disbursements, which total $199,958, plus prejudgment interest.

WHEREFORE, the Trustee respectfully requests that this Court enter a judgment in her favor against Aegis for damages in the amount of $199,958, plus prejudgment interest, and for such other and further relief as the Court deems just and proper

## COUNT III
## NEGLIGENT MISREPRESENTATION
### (Against Kane Jr.)

42.    The Trustee incorporates and realleges paragraphs 1 through 25 of this Complaint as is fully set forth herein.

43.    Kane Jr. misrepresented to the Debtor and others that the Manulife Notes were fully satisfied and that Manulife provided a release of its security interest in the Debtor's partnership interest in Adare.

44.    Kane Jr. either knew or should have known that the representations were false.

45.    Kane Jr. intended to induce another to act upon the false representations.

46.    In reliance on Kane Jr.'s repeated false representations, the Debtor received monies from Adare that he would not have otherwise received.

47.     The Debtor justifiably relied on the misrepresentations.

48.     As a proximate result of the Debtor's justifiable reliance, the Debtor and now his bankruptcy estate suffered substantial damages totaling in the millions of dollars resulting from his alleged obligation under the Manulife Notes, the proof of claim Manulife filed against the Debtor's bankruptcy estate, and the legal fees incurred as a result of the Manulife Litigation.

WHEREFORE, the Trustee respectfully requests that this Court enter a judgment in her favor against Kane Jr. for compensatory damages, and any other and further relief as this Court deems just and proper.

### COUNT IV
### FRAUDULENT MISREPRESENTATION
### (Against Kane Jr.)

49.     The Trustee incorporates and realleges paragraphs 1 through 25 of this Complaint as is fully set forth herein.

50.     Kane Jr. made false statements to the Debtor and others that the Manulife Notes were fully satisfied and that Manulife provided a release of its security interest in the Debtor's partnership interest in Adare.

51.     These false statements concerned material facts.

52.     Kane Jr. knew that the statements were false and intended that the statements would induce others' reliance.

53.     In reliance on Kane Jr.'s repeated false representations, the Debtor received monies from Adare that he would not have otherwise received.

54.     As a proximate result of the Debtor's justifiable reliance, the Debtor and now his bankruptcy estate suffered substantial damages totaling in the millions of dollars resulting from

his alleged obligation under the Manulife Notes, the proof of claim Manulife filed against the

Debtor's bankruptcy estate, and the legal fees incurred as a result of the Manulife Litigation.

WHEREFORE, the Trustee respectfully requests that this Court enter a judgment in her

favor against Kane Jr. for compensatory damages, and any other and further relief as this Court

deems just and proper.

Dated the ___27ᵗʰ___ day of March, 2014.

Respectfully submitted,

BAST AMRON LLP
*Counsel for Chapter 7 Trustee*
SunTrust International Center
One Southeast Third Avenue, Suite 1440
Miami, Florida 33131
Telephone: 305.379.7904
Facsimile: 305.379.7905
Email: bamron@bastamron.com
Email: hgerson@bastamron.com

By: */s/ Brett M. Amron*
    Brett M. Amron (FBN 148342)
    Hayley E. Gerson (FBN 105157)

# Exhibit "A"

<u>EXHIBIT B</u>

THIS NOTE AND THE SECURITIES REPRESENTED BY THIS NOTE HAVE BEEN ACQUIRED FOR INVESTMENT PURPOSES ONLY AND HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR UNDER ANY APPLICABLE STATE SECURITIES LAWS.  THIS NOTE MAY NOT BE SOLD OR OTHERWISE TRANSFERRED OR PLEDGED, EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT OR SUCH APPLICABLE STATE SECURITIES LAWS, OR IF THE PROPOSED TRANSFER MAY BE EFFECTED WITHOUT REGISTRATION UNDER THE SECURITIES ACT OR REGISTRATION OR QUALIFICATION UNDER THE APPLICABLE STATE SECURITIES LAWS.

AEGIS INVESTMENT PARTNERS, LLC.

CASH FLOW DRAW NOTE ("NOTE")

$200,000

Denver, Colorado
July 1, 2003

Section 1.    <u>General</u>.  For value received, Aegis Investment Partners, LLC, a Delaware limited liability company, (the "Payor") hereby promises to pay to the order of THOMAS F. KANE, SR. or his assigns (the "Payee"), the principal amount of $200,000, or so much funds of such amount as may be advanced to Payor by each Payee pursuant hereto and outstanding, together with interest accrued thereon, from day to day.  All payments hereunder shall be made in such currency of the United States of America as at the time of payment shall be legal tender therein for the payment of public and private debts.  Interest shall accrue on the unpaid balance of the principal amount of this Note from and including the date hereof but excluding the date on which the principal amount of this Note is paid in full at a rate of annum (computed on the basis of a 360-day year and the actual number of days elapsed)(the "Interest Rate") equal to the Prime Rate publicly announced by the Wall Street Journal on the date hereof.  The principal of, and accrued interest on, the Note shall be payable at maturity by wire transfer of immediately available funds to the account of the Payee or by certified or official bank check payable to the Payee mailed to the Payee at the address of the Payee as set forth on the records of the Payor or such other address as shall be designated in writing by the Payee to the Payor.

Section 2.    <u>Conditions Precedent</u>.  This Note is issued pursuant and subject to the terms and conditions of that certain Amended and Restated Operating Agreement of Payor (the "Amended Agreement").  This Note evidences and represents monies that will be advanced to Payor, in a series of advancements, whose total may equal in the aggregate the original principal amount hereof, to be made as follows: (i) $50,000 that was advanced on May 5, 2003; (ii) $50,000 to be advanced on the fifteenth day of each month of August, September and October 2003 (collectively, the "Draw Amount").

Exhibit B

Section 3.    Defaults.  Upon the occurrence of any of the following events, the entire unpaid principal of this Note, together with all accrued interest thereon, shall become immediately due and payable, and the Payee shall be entitled to pursue all remedies which the Payee may have at law or in equity for the enforcement and collection hereof:

(a)    The failure of the Payor to make the full payment of all interest and principal due on this Note on the Maturity Date; or,

(b)    The Payor shall make an assignment for the benefit of creditors, file a petition in bankruptcy, consent to entry of an order for relief against it in an involuntary case, be adjudicated insolvent or bankrupt, petition or apply to any tribunal for the appointment of any receiver, trustee or similar official for it or a substantial part of its assets, or commence any proceedings under any bankruptcy, reorganization, arrangement, readjustment of debt, dissolution or liquidation law or statute of any jurisdiction, whether nor or hereafter in effect; there shall occur the appointment of a receiver, trustee, assignee, liquidator, custodian or similar official of it or a substantial part of its assets; or there shall have been filed any such petition or application or any such proceeding shall have been commenced against it, which remains undismissed for a period of sixty (60) days of more; the Payor by any act or omission shall indicate its consent to, approval of or acquiescence in any such petition, application or proceeding or the appointment of any trustee for it or any substantial part of any of its properties; or,

(c)    A court of competent jurisdiction shall enter an order or decree under any bankruptcy law that is for relief against the Payor in an involuntary case, appoints a receiver, trustee, assignee, liquidator or similar official of the Payor or for any substantial part of its property or orders the liquidation of the Payor; and the order or decree remains unstayed and in effect for thirty (30) days.

Section 4.    Exchange or Replacement of Notes.

(a)    The Payee may, at its option, in person or by duly authorized attorney, surrender this Note for exchange, at the principal business office of the Payor, and receive in exchange therefore, a new Note in the same principal amount as the unpaid principal amount of this Note and bearing interest at the same annual rate as this Note, each such new Note to be dated as of the date of this Note and to be in such principal amount as remains unpaid and payable to the Payee.

(b)    Upon receipt by the Payor of evidence satisfactory to it of the loss, theft, destruction, or mutilation of this Note and (in the case of loss, theft or destruction) of an indemnity reasonably satisfactory to it, and upon surrender and cancellation of this Note, if mutilated, the Payor will deliver a new Note of like tenor in lieu of this Note.  Any Note delivered in accordance with the provisions of this Section 5 shall be dated as of the date if this Note.

EXHIBIT B

Section 5.    Repayment of Note.    The principal of and interest on this Note shall be due and payable monthly, on or before the first day of each calendar month, commencing no later than January 1, 2004, and on the first day of each successive calendar month thereafter from Distributable Cash (as defined hereinafter) attributable to the preceding calendar month, as follows:

(i)    Pursuant to Section 6(e) of the Amended Agreement until the entire unpaid principal balance of and accrued interest on the Note shall have been paid in full.

(ii)    Payments received under the above clause (i) shall be applied first to the accrued unpaid interest and the balance, if any, shall be applied toward the payment of the unpaid principal balance hereof.

(iii)    Any unpaid principal balance and accrued unpaid interest on the Note shall be due and payable of the third anniversary of the date of this Note.

"Distributable Cash" for purposes of this Note shall have the same meaning herein as such term is defined in Section 1 of the Amended Agreement and shall be determined in accordance with generally accepted accounting principals consistently applied to the extent consistent with provision of such Section 1.  Each payment shall be accompanied by a detailed statement of calculating Distributable Cash for the preceding calendar month certified to be true and correct and to accurately reflect the income and expense of the Payor, including income and expense paid by the Partnership for said period by the Board of Directors and Managing Member of Payor.

If any installments of principal or interest on this Note shall become due on a Saturday, Sunday or any other day on which banks are not open for business, such payment shall be made on the next succeeding day on which banks are open for business; and such extension of time shall in such case be included in computing interest in connection with such payment.

Section 6.    Additional Consideration.    As added consideration for providing the Original Draw Amount, Payee shall be entitled to receive Five Percent (5%) of the net capital gains that Payor receives in excess of $10,000,000 from the sale of any asset of or any equity interest held by Payor, including, but not limited to Aegis Investment Advisers, L.L.C. and Venture-Vortex, Inc. ("Incentive Proceeds").  All Incentive Proceeds shall be due and payable upon receipt by the Company of any sales proceeds.

Section 7.    Attorneys' and Collection Fees.  Should the indebtedness evidenced by this Note or any part thereof be collected at law or in equity or in bankruptcy, receivership or other court proceedings, the Payor agrees to pay, in addition to the principal and interest due and payable hereon, all costs of collection, including reasonable attorneys' fees and expenses, incurred by the Payee in collecting and enforcing this Note.

<u>EXHIBIT B</u>

Section 8.    <u>Waivers</u>.  Payor hereby waives presentment, demand for payment, notice of dishonor, notice of protest and all other notices or demands in connection with the delivery, acceptance, performance or default of this Note.  No delay by Payee in exercising any power or right hereunder shall operate as a waiver or any power or right, nor shall any single or partial exercise of any power or right preclude other of further exercise thereof, or the exercise thereof, or the exercise of any other power or right hereunder or otherwise; and no waiver whatsoever or modification of the terms hereof shall be valid unless set forth in writing by the Payee and only to the extent set forth therein.

Section 9.    <u>Amendments and Waivers</u>.  No provision of this Note may be amended or waived without the express written consent of both Payor and Payee.

Section 10.    <u>Governing Law</u>.  This Note is made and delivered in, and shall be governed by and construed in accordance with the laws of the State of Colorado (without giving effect to principles of conflict of laws of the State of Colorado or any other state).

Section 11.    <u>Notices</u>.    All notices, requests, demands and other similar communications to any party hereunder shall be in writing (including telecopier or similar writing) and shall be given to such party at its address or telecopier number set forth below or such other address or telecopier number as such party maay hereafter specify by notice to the other parties listed below.

| | |
|---|---|
| If to Payor: | Mr. Thomas F. Kane, Jr. |
| | Managing Member |
| | Aegis Investment Partners, LLC |
| | 4600 South Syracuse Street, Suite 1080 |
| | Denver, Colorado 80237 |
| | |
| If to Payee: | Thomas F. Kane, Sr. |
| | 13845 Rivoli Drive |
| | Palm Beach Gardens, Florida 33410 |

Each such notice, request or other communication shall be effective (i) if given by telecopier or other form of facsimile transmission, when the recipient confirms the legible transmission thereof, or (ii) if given by any other means, when delivered at the address specified in this Section 10.

Section 12.    <u>Representations and Warranties of the Payee</u>.  The Payee hereby acknowledges, represents and warrants to, and agrees with, the Company as follows:

(a)    The Payee understands that the offering and sale of the Incentive Proceeds are intended to be exempt from registration under the Securities Act of 1933, as amended (the "Securities Act"), by virtue of Section 4(2) of the Securities Act and the rules and regulations promulgated thereunder and, in accordance therewith and in furtherance

EXHIBIT B

thereof, the undersigned represents and warrants tom and agrees with, the Company as follows:

(i)    The Payee acknowledges that no offering statement, prospectus or offering circular containing information with respect to the Company or the Incentive Proceeds has been prepared and that the undersigned has made its own inquiry and analysis with respect to the Company and the Incentive Proceeds;

(ii)    The Payee and/or its advisor(s) have been supplied with or have sufficient access to all information, including business plans, projected budgets and other financial information of the Company, to which a reasonable investor would attach significance in making investment decisions, and has had the opportunity to ask questions and receive answers from knowledgeable individuals concerning the Company and the Incentive Proceeds, so that as a reasonable investor, the undersigned has been able to make his decision to purchase the Incentive Proceeds.

(iii)    The Payee and/or its advisor(s) have had a reasonable opportunity to ask questions of and receive answers from a person or persons acting on behalf of the Company concerning the offering of the Incentive Proceeds, and all such questions have been answered to the full satisfaction of the undersigned;

(iv)    No oral or written representations have been made and no oral or written information furnished to the Payee or its advisor(s) in connection with the offering of the Incentive Proceeds were in any way inconsistent with any other information with which the undersigned has been provided;

(v)    The Payee is not subscribing for Incentive Proceeds as a result of or subsequent to any advertisement, article, notice or other communication published in any newspaper, magazine or similar media or broadcast over television or radio or presented at any seminar or meeting, or any solicitation of a subscription by a person not previously known to the undersigned in connection with investments in securities generally;

(vi)    The Payee has reached the age of majority in the state in which the Payee resides, has adequate means of providing for the Payee's current financial needs and contingencies, is able to bear the substantial economic risks of an investment in the Incentive Proceeds for an indefinite period of time, has no need for liquidity in such investment, has made commitments to investments that are not readily marketable which are reasonable in relation to the Payee's net worth and, at present time, could afford a complete loss of such investment;

EXHIBIT B

(vi)    The Payee or its advisor(s), as the case may be, have such knowledge and experience in financial, tax, and business matters so a to enable it to utilize the information made available to it in connection with the offering of the Incentive Proceeds to evaluate the merits and risks of an investment in the Incentive Proceeds and to make an informed investment decision with respect thereto;

(vii)    The Payee is not relying on the Company with respect to the tax and other economic considerations of an investment and the undersigned has relied on the advice of, or has consulted with, its own advisor(s);

(viii)    The Payee will not sell or otherwise transfer the Incentive Proceeds without registration under the Securities Act or an exemption therefrom and fully understands and agrees that it must bear the economic risk of its purchase for an indefinite period of time because, among other reasons, the Incentive Proceeds have not been registered under the Securities Act or under the securities laws of certain states and, therefore, cannot be resold, pledged, assigned or otherwise disposed of unless the securities are subsequently registered under the Securities Act and under the applicable securities laws of such states or unless an exemption from registration is available in the opinion of counsel for the holder, which counsel and opinion are reasonably satisfactory to counsel for the Company.  The Payee represents that it currently is willing and able to bear the economic risk of its investment in the Incentive Proceeds, has no need for liquidity with respect thereto, is able to sustain a complete loss of its investment and is purchasing the Incentive Proceeds for its own account, for investment and not with a view to resale or distribution except in compliance with the Securities Act.  The Payee is aware that an exemption from the registration requirements of the Securities Act pursuant to Rule 144 promulgated thereunder is not presently available; that the Company has no obligation to make available an exemption from the registration requirements pursuant to such Rule 144 or any successor rule for resale of the Incentive Proceeds; and that even if an exemption under Rule 144 were available, Rule 144 permits only the routine sales of securities in limited amounts in accordance with the terms and conditions of such Rule 144.  The Payee further acknowledges that there is presently no market for the purchase and sale of the Incentive Proceeds and that no such market may ever exist; and the undersigned understands that the Company is under no obligation to register the Incentive Proceeds on its behalf or to assist it in complying with any exemption from registration under the Securities Act or under the securities laws of any state.

(b)    The Payee is a United States citizen and (i) a natural person who had individual income in excess of US$200,000 in each of the two most recent years or joint income with the undersigned's spouse in excess of US$300,000 in each of those years, and who reasonably expects to reach the same income level in the current year; or,

EXHIBIT B

(ii) a natural person whose individual net worth, or joint net worth with the undersigned's spouse, is in excess of US$1,000,000.

(c)    The representations and warranties contained herein are true and correct as of the date hereof and may be relied upon by the Company, and the undersigned will notify the Company immediately of any adverse change in any such representations and warranties that may occur prior to the acceptance of the subscription and will promptly send the Company written confirmation thereof.    The representations, warranties, and agreements of the undersigned contained herein shall survive the execution and delivery of the Subscription Agreement and the purchase of the Incentive Proceeds.

IN WITNESS WHEREOF, the Payor has caused this Note to be duly executed by its duly authorized officer as of the date first written above.

Aegis Investment Partners, LLC

By:_____
Thomas F. Kane, Jr.
Managing Member

Acknowledged and Agreed:

Thomas F. Kane, Sr.

By: _____

EXHIBIT B

(ii) a natural person whose individual net worth, or joint net worth with the undersigned's spouse, is in excess of US$1,000,000.

(c)     The representations and warranties contained herein are true and correct as of the date hereof and may be relied upon by the Company, and the undersigned will notify the Company immediately of any adverse change in any such representations and warranties that may occur prior to the acceptance of the subscription and will promptly send the Company written confirmation thereof.    The representations, warranties, and agreements of the undersigned contained herein shall survive the execution and delivery of the Subscription Agreement and the purchase of the Incentive Proceeds.

IN WITNESS WHEREOF, the Payor has caused this Note to be duly executed by its duly authorized officer as of the date first written above.

Aegis Investment Partners, LLC

By:

Thomas F. Kane, Jr.
Managing Member

Acknowledged and Agreed:

Thomas F. Kane, Sr.

By:

**Exhibit "B"**



**BASTAMRON**

ATTORNEYS AT LAW

SUNTRUST INTERNATIONAL CENTER
ONE SOUTHEAST THIRD AVENUE
SUITE 1440
MIAMI, FLORIDA 33131
OFFICE:      305.379.7904
FACSIMILE: 305.379.7905
www.bastamron.com

JOHN R. EDER
EMAIL: jeder@bastamron.com

March 29, 2012

**DEMAND FOR PAYMENT**

**Via U.S. Mail and E-Mail**
Thomas F. Kane, Jr.
Aegis Investment Partners, LLC
6465 Greenwood Plaza Blvd.
Suite 150
Centennial, CO 80111
Email: tomkane@aegisinvestments.com

> Re: *In re Thomas F. Kane, Case No. 11-36816-PGH*
> *Repayment of Cash Flow Draw Note*

Dear Mr. Kane:

As you are aware, on September 28, 2011 (the "Petition Date"), Thomas F. Kane (the "Debtor"), filed for relief under Chapter 7 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Florida. Nicole Testa Mehdipour is the duly appointed Chapter 7 Trustee (the "Trustee") for the Debtor's bankruptcy estate.

On February 16, 2012, the Trustee served a subpoena *duces tecum* (the "Subpoena") upon Aegis Investment Partners, LLC ("Aegis") requesting the production of documents. On or about February 27, 2012, Aegis provided the Trustee documents and written responses to the Subpoena. According to the written responses, Aegis issued a Cash Flow Draw Note (the "Note") to the Debtor in the amount of $200,000 and, pursuant to the Note, the Debtor made four payments to Aegis totaling $200,000.

In response to the Subpoena, the Trustee received copies of the executed Note and operating agreements of Aegis. According to the Note and the July 1, 2003 Amended and Restated Operating Agreement of Aegis, the Note was first in line to be repaid from Distributable Cash (as defined in the Note). Copies of the Note and Operating Agreement are attached hereto for ease of reference. Repayment of the Note was to have commenced no later than January 1, 2004. To date, no portion of the Note has been repaid to the Debtor even though between 2009 and 2011 $373,803 of cash flow was used to pay down operating advances you

Aegis Investment Partners, LLC
March 29, 2012
Page 2 of 2

made to Aegis and approximately $194,100 was paid in distributions, money which should have been used to first satisfy repayment of the Note.

Daily compounding interest was to have accrued on the unpaid balance of the Note at a rate of 4%, equal to the prime rate as of July 1, 2003. As of the date of this letter, the total amount due and owing on the Note, including accrued interest, is approximately $281,000. The Trustee hereby demands repayment of $281,000 currently due and owing on the Note to be received by the Trustee no later than fifteen (15) days from the date of this letter. Please make your check or money order payable to "Nicole Testa Mehdipour, Trustee" and mail to:

BAST AMRON LLP
John R. Eder, Esq.
SunTrust International Center
One Southeast Third Ave.
Suite 1440
Miami, Florida 33131

If full repayment of the Note is not timely received, the Trustee may commence an adversary proceeding in the Bankruptcy Court against Aegis to recover, among other things, the full amount due and owing on the Note, plus interest at the highest rate allowed under the applicable law, as well as attorneys' fees and costs.

If you have any questions regarding this demand, you may contact me by phone at 305-379-7904 or by email at jeder@bastamron.com. Additionally, if you have an attorney, you may direct this letter to him or her and provide me with his or her contact information.

PLEASE GOVERN YOURSELF ACCORDINGLY.

Sincerely,

John R. Eder, Esq.

Enclosures
cc:    Nicole Testa Mehdipour, Trustee

{00091529.DOC 2}

EXHIBIT B

THIS NOTE AND THE SECURITIES REPRESENTED BY THIS NOTE HAVE BEEN ACQUIRED FOR INVESTMENT PURPOSES ONLY AND HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR UNDER ANY APPLICABLE STATE SECURITIES LAWS. THIS NOTE MAY NOT BE SOLD OR OTHERWISE TRANSFERRED OR PLEDGED, EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT OR SUCH APPLICABLE STATE SECURITIES LAWS, OR IF THE PROPOSED TRANSFER MAY BE EFFECTED WITHOUT REGISTRATION UNDER THE SECURITIES ACT OR REGISTRATION OR QUALIFICATION UNDER THE APPLICABLE STATE SECURITIES LAWS.

## AEGIS INVESTMENT PARTNERS, LLC.

### CASH FLOW DRAW NOTE ("NOTE")

$200,000

Denver, Colorado
July 1, 2003

Section 1.    General.   For value received, Aegis Investment Partners, LLC, a Delaware limited liability company, (the "Payor") hereby promises to pay to the order of THOMAS F. KANE, SR. or his assigns (the "Payee"), the principal amount of $200,000, or so much funds of such amount as may be advanced to Payor by each Payee pursuant hereto and outstanding, together with interest accrued thereon, from day to day.  All payments hereunder shall be made in such currency of the United States of America as at the time of payment shall be legal tender therein for the payment of public and private debts.  Interest shall accrue on the unpaid balance of the principal amount of this Note from and including the date hereof but excluding the date on which the principal amount of this Note is paid in full at a rate of annum (computed on the basis of a 360-day year and the actual number of days elapsed)(the "Interest Rate") equal to the Prime Rate publicly announced by the Wall Street Journal on the date hereof.  The principal of, and accrued interest on, the Note shall be payable at maturity by wire transfer of immediately available funds to the account of the Payee or by certified or official bank check payable to the Payee mailed to the Payee at the address of the Payee as set forth on the records of the Payor or such other address as shall be designated in writing by the Payee to the Payor.

Section 2.    Conditions Precedent.  This Note is issued pursuant and subject to the terms and conditions of that certain Amended and Restated Operating Agreement of Payor (the "Amended Agreement").  This Note evidences and represents monies that will be advanced to Payor, in a series of advancements, whose total may equal in the aggregate the original principal amount hereof, to be made as follows: (i) $50,000 that was advanced on May 5, 2003; (ii) $50,000 to be advanced on the fifteenth day of each month of August, September and October 2003 (collectively, the "Draw Amount").

<u>Exhibit B</u>

Section 3.    <u>Defaults</u>.  Upon the occurrence of any of the following events, the entire unpaid principal of this Note, together with all accrued interest thereon, shall become immediately due and payable, and the Payee shall be entitled to pursue all remedies which the Payee may have at law or in equity for the enforcement and collection hereof:

(a)    The failure of the Payor to make the full payment of all interest and principal due on this Note on the Maturity Date; or,

(b)    The Payor shall make an assignment for the benefit of creditors, file a petition in bankruptcy, consent to entry of an order for relief against it in an involuntary case, be adjudicated insolvent or bankrupt, petition or apply to any tribunal for the appointment of any receiver, trustee or similar official for it or a substantial part of its assets, or commence any proceedings under any bankruptcy, reorganization, arrangement, readjustment of debt, dissolution or liquidation law or statute of any jurisdiction, whether nor or hereafter in effect; there shall occur the appointment of a receiver, trustee, assignee, liquidator, custodian or similar official of it or a substantial part of its assets; or there shall have been filed any such petition or application or any such proceeding shall have been commenced against it, which remains undismissed for a period of sixty (60) days of more; the Payor by any act or omission shall indicate its consent to, approval of or acquiescence in any such petition, application or proceeding or the appointment of any trustee for it or any substantial part of any of its properties; or,

(c)    A court of competent jurisdiction shall enter an order or decree under any bankruptcy law that is for relief against the Payor in an involuntary case, appoints a receiver, trustee, assignee, liquidator or similar official of the Payor or for any substantial part of its property or orders the liquidation of the Payor; and the order or decree remains unstayed and in effect for thirty (30) days.

Section 4.    <u>Exchange or Replacement of Notes</u>.

(a)    The Payee may, at its option, in person or by duly authorized attorney, surrender this Note for exchange, at the principal business office of the Payor, and receive in exchange therefore, a new Note in the same principal amount as the unpaid principal amount of this Note and bearing interest at the same annual rate as this Note, each such new Note to be dated as of the date of this Note and to be in such principal amount as remains unpaid and payable to the Payee.

(b)    Upon receipt by the Payor of evidence satisfactory to it of the loss, theft, destruction, or mutilation of this Note and (in the case of loss, theft or destruction) of an indemnity reasonably satisfactory to it, and upon surrender and cancellation of this Note, if mutilated, the Payor will deliver a new Note of like tenor in lieu of this Note.  Any Note delivered in accordance with the provisions of this Section 5 shall be dated as of the date if this Note.

<u>EXHIBIT B</u>

Section 5. <u>Repayment of Note</u>. The principal of and interest on this Note shall be due and payable monthly, on or before the first day of each calendar month, commencing no later than January 1, 2004, and on the first day of each successive calendar month thereafter from Distributable Cash (as defined hereinafter) attributable to the preceding calendar month, as follows:

(i)   Pursuant to Section 6(e) of the Amended Agreement until the entire unpaid principal balance of and accrued interest on the Note shall have been paid in full.

(ii)   Payments received under the above clause (i) shall be applied first to the accrued unpaid interest and the balance, if any, shall be applied toward the payment of the unpaid principal balance hereof.

(iii)   Any unpaid principal balance and accrued unpaid interest on the Note shall be due and payable of the third anniversary of the date of this Note.

"Distributable Cash" for purposes of this Note shall have the same meaning herein as such term is defined in Section 1 of the Amended Agreement and shall be determined in accordance with generally accepted accounting principals consistently applied to the extent consistent with provision of such Section 1. Each payment shall be accompanied by a detailed statement of calculating Distributable Cash for the preceding calendar month certified to be true and correct and to accurately reflect the income and expense of the Payor, including income and expense paid by the Partnership for said period by the Board of Directors and Managing Member of Payor.

If any installments of principal or interest on this Note shall become due on a Saturday, Sunday or any other day on which banks are not open for business, such payment shall be made on the next succeeding day on which banks are open for business; and such extension of time shall in such case be included in computing interest in connection with such payment.

Section 6. <u>Additional Consideration</u>. As added consideration for providing the Original Draw Amount, Payee shall be entitled to receive Five Percent (5%) of the net capital gains that Payor receives in excess of $10,000,000 from the sale of any asset of or any equity interest held by Payor, including, but not limited to Aegis Investment Advisers, L.L.C. and Venture-Vortex, Inc. ("Incentive Proceeds"). All Incentive Proceeds shall be due and payable upon receipt by the Company of any sales proceeds.

Section 7. <u>Attorneys' and Collection Fees</u>. Should the indebtedness evidenced by this Note or any part thereof be collected at law or in equity or in bankruptcy, receivership or other court proceedings, the Payor agrees to pay, in addition to the principal and interest due and payable hereon, all costs of collection, including reasonable attorneys' fees and expenses, incurred by the Payee in collecting and enforcing this Note.

<u>EXHIBIT B</u>

Section 8.    <u>Waivers</u>.  Payor hereby waives presentment, demand for payment, notice of dishonor, notice of protest and all other notices or demands in connection with the delivery, acceptance, performance or default of this Note.  No delay by Payee in exercising any power or right hereunder shall operate as a waiver or any power or right, nor shall any single or partial exercise of any power or right preclude other of further exercise thereof, or the exercise thereof, or the exercise of any other power or right hereunder or otherwise; and no waiver whatsoever or modification of the terms hereof shall be valid unless set forth in writing by the Payee and only to the extent set forth therein.

Section 9.    <u>Amendments and Waivers</u>.  No provision of this Note may be amended or waived without the express written consent of both Payor and Payee.

Section 10.    <u>Governing Law</u>.  This Note is made and delivered in, and shall be governed by and construed in accordance with the laws of the State of Colorado (without giving effect to principles of conflict of laws of the State of Colorado or any other state).

Section 11.    <u>Notices</u>.    All notices, requests, demands and other similar communications to any party hereunder shall be in writing (including telecopier or similar writing) and shall be given to such party at its address or telecopier number set forth below or such other address or telecopier number as such party maay hereafter specify by notice to the other parties listed below.

If to Payor:        Mr. Thomas F. Kane, Jr.
                    Managing Member
                    Aegis Investment Partners, LLC
                    4600 South Syracuse Street, Suite 1080
                    Denver, Colorado 80237

If to Payee:        Thomas F. Kane, Sr.
                    13845 Rivoli Drive
                    Palm Beach Gardens, Florida 33410

Each such notice, request or other communication shall be effective (i) if given by telecopier or other form of facsimile transmission, when the recipient confirms the legible transmission thereof, or (ii) if given by any other means, when delivered at the address specified in this Section 10.

Section 12.    <u>Representations and Warranties of the Payee</u>.  The Payee hereby acknowledges, represents and warrants to, and agrees with, the Company as follows:

(a)    The Payee understands that the offering and sale of the Incentive Proceeds are intended to be exempt from registration under the Securities Act of 1933, as amended (the "Securities Act"), by virtue of Section 4(2) of the Securities Act and the rules and regulations promulgated thereunder and, in accordance therewith and in furtherance

<u>Exhibit B</u>

thereof, the undersigned represents and warrants tom and agrees with, the Company as follows:

(i)     The Payee acknowledges that no offering statement, prospectus or offering circular containing information with respect to the Company or the Incentive Proceeds has been prepared and that the undersigned has made its own inquiry and analysis with respect to the Company and the Incentive Proceeds;

(ii)     The Payee and/or its advisor(s) have been supplied with or have sufficient access to all information, including business plans, projected budgets and other financial information of the Company, to which a reasonable investor would attach significance in making investment decisions, and has had the opportunity to ask questions and receive answers from knowledgeable individuals concerning the Company and the Incentive Proceeds, so that as a reasonable investor, the undersigned has been able to make his decision to purchase the Incentive Proceeds.

(iii)     The Payee and/or its advisor(s) have had a reasonable opportunity to ask questions of and receive answers from a person or persons acting on behalf of the Company concerning the offering of the Incentive Proceeds, and all such questions have been answered to the full satisfaction of the undersigned;

(iv)     No oral or written representations have been made and no oral or written information furnished to the Payee or its advisor(s) in connection with the offering of the Incentive Proceeds were in any way inconsistent with any other information with which the undersigned has been provided;

(v)     The Payee is not subscribing for Incentive Proceeds as a result of or subsequent to any advertisement, article, notice or other communication published in any newspaper, magazine or similar media or broadcast over television or radio or presented at any seminar or meeting, or any solicitation of a subscription by a person not previously known to the undersigned in connection with investments in securities generally;

(vi)     The Payee has reached the age of majority in the state in which the Payee resides, has adequate means of providing for the Payee's current financial needs and contingencies, is able to bear the substantial economic risks of an investment in the Incentive Proceeds for an indefinite period of time, has no need for liquidity in such investment, has made commitments to investments that are not readily marketable which are reasonable in relation to the Payee's net worth and, at present time, could afford a complete loss of such investment;

(vi)    The Payee or its advisor(s), as the case may be, have such knowledge and experience in financial, tax, and business matters so a to enable it to utilize the information made available to it in connection with the offering of the Incentive Proceeds to evaluate the merits and risks of an investment in the Incentive Proceeds and to make an informed investment decision with respect thereto;

(vii)    The Payee is not relying on the Company with respect to the tax and other economic considerations of an investment and the undersigned has relied on the advice of, or has consulted with, its own advisor(s);

(viii)    The Payee will not sell or otherwise transfer the Incentive Proceeds without registration under the Securities Act or an exemption therefrom and fully understands and agrees that it must bear the economic risk of its purchase for an indefinite period of time because, among other reasons, the Incentive Proceeds have not been registered under the Securities Act or under the securities laws of certain states and, therefore, cannot be resold, pledged, assigned or otherwise disposed of unless the securities are subsequently registered under the Securities Act and under the applicable securities laws of such states or unless an exemption from registration is available in the opinion of counsel for the holder, which counsel and opinion are reasonably satisfactory to counsel for the Company.  The Payee represents that it currently is willing and able to bear the economic risk of its investment in the Incentive Proceeds, has no need for liquidity with respect thereto, is able to sustain a complete loss of its investment and is purchasing the Incentive Proceeds for its own account, for investment and not with a view to resale or distribution except in compliance with the Securities Act.  The Payee is aware that an exemption from the registration requirements of the Securities Act pursuant to Rule 144 promulgated thereunder is not presently available; that the Company has no obligation to make available an exemption from the registration requirements pursuant to such Rule 144 or any successor rule for resale of the Incentive Proceeds; and that even if an exemption under Rule 144 were available, Rule 144 permits only the routine sales of securities in limited amounts in accordance with the terms and conditions of such Rule 144.  The Payee further acknowledges that there is presently no market for the purchase and sale of the Incentive Proceeds and that no such market may ever exist; and the undersigned understands that the Company is under no obligation to register the Incentive Proceeds on its behalf or to assist it in complying with any exemption from registration under the Securities Act or under the securities laws of any state.

(b)    The Payee is a United States citizen and (i) a natural person who had individual income in excess of US$200,000 in each of the two most recent years or joint income with the undersigned's spouse in excess of US$300,000 in each of those years, and who reasonably expects to reach the same income level in the current year; or,

<u>EXHIBIT B</u>

(ii) a natural person whose individual net worth, or joint net worth with the undersigned's spouse, is in excess of US$1,000,000.

   (c)  The representations and warranties contained herein are true and correct as of the date hereof and may be relied upon by the Company, and the undersigned will notify the Company immediately of any adverse change in any such representations and warranties that may occur prior to the acceptance of the subscription and will promptly send the Company written confirmation thereof. The representations, warranties, and agreements of the undersigned contained herein shall survive the execution and delivery of the Subscription Agreement and the purchase of the Incentive Proceeds.

IN WITNESS WHEREOF, the Payor has caused this Note to be duly executed by its duly authorized officer as of the date first written above.

       Aegis Investment Partners, LLC

       By:_____
        Thomas F. Kane, Jr.
        Managing Member

Acknowledged and Agreed:

Thomas F. Kane, Sr.

By: _____

(ii) a natural person whose individual net worth, or joint net worth with the undersigned's spouse, is in excess of US$1,000,000.

(c)    The representations and warranties contained herein are true and correct as of the date hereof and may be relied upon by the Company, and the undersigned will notify the Company immediately of any adverse change in any such representations and warranties that may occur prior to the acceptance of the subscription and will promptly send the Company written confirmation thereof.    The representations, warranties, and agreements of the undersigned contained herein shall survive the execution and delivery of the Subscription Agreement and the purchase of the Incentive Proceeds.

IN WITNESS WHEREOF, the Payor has caused this Note to be duly executed by its duly authorized officer as of the date first written above.

Aegis Investment Partners, LLC

By: _____

Thomas F. Kane, Jr.
Managing Member

Acknowledged and Agreed:

Thomas F. Kane, Sr.

By: _____

AEGIS INVESTMENT PARTNERS, L.L.C.

AMENDED AND RESTATED OPERATING AGREEMENT

DATED AS OF JULY 1, 2003

---------------------

THE MEMBERSHIP INTERESTS REFERRED TO IN THIS AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933 OR UNDER ANY OTHER APPLICABLE SECURITIES LAWS. SUCH MEMBERSHIP INTERESTS MAY NOT BE SOLD, ASSIGNED, PLEDGED OR OTHERWISE DISPOSED OF AT ANY TIME WITHOUT EFFECTIVE REGISTRATION UNDER SUCH ACT AND LAWS OR EXEMPTION THEREFROM, AND COMPLIANCE WITH THE OTHER SUBSTANTIAL RESTRICTIONS ON TRANSFERABILITY SET FORTH OR REFERRED TO HEREIN.

---------------------

Final                                                                                                7/3/2003

TABLE OF CONTENTS

1.   Certain Definitions. .................................................................................................. 2
2.   Organization. ............................................................................................................ 7
3.   Principal Place of Business; Registered Office; Fiscal Year and Fiscal Periods. .................... 7
4.   Purposes and Powers of the Company. ............................................................................ 7
5.   Capital Contributions and Capital Accounts. .................................................................... 8
6.   Allocations and Distributions. .................................................................................... 10
7.   Books of Account; Reports. ........................................................................................ 12
8.   Management of the Company. ...................................................................................... 12
9.   Managing Member. .................................................................................................. 14
10.  Other Activities of the Members and Non-competition; Investment Representations. ....... 16
11.    Expenses and Fees. ............................................................................................... 18
12.  Transfers of Interests; Admission; Death of a Member. ..................................................... 18
13.  Forfeiture; Restricted Interests. .................................................................................. 20
14.  Dissolution of Company. ............................................................................................ 22
15.  Winding Up of the Company. ...................................................................................... 22
16.  Action by and Meetings of the Members. ...................................................................... 24
17.  Members' Covenants; Breach. .................................................................................... 25
18.  General. .................................................................................................................. 25

Schedule A:        Members' Names and Addresses

Exhibit A:        Ownership Schedule and Initial Capital Accounts
Exhibit B:        Cash Flow Draw Note
Exhibit C:        Cash Flow Draw Note Holders
Exhibit D:        Subordinated Note
Exhibit E:        Subordinated Note Holders
Exhibit F:        Pro-Forma Operating Budgets
Exhibit G:        Employment Agreements
Exhibit H:        Transfer Acknowledgement
Exhibit I:        Consulting Agreements

Final                                                                                                    7/3/2003

## AEGIS INVESTMENT PARTNERS, L.L.C.
## AMENDED AND RESTATED OPERATING AGREEMENT

This Amended and Restated Operating Agreement ("Amended Agreement"), dated as of July 1, 2003, is entered into by and between each of the individuals listed on the attached Schedule A (each a "**Member**" and collectively the "**Members**").

### RECITALS

WHEREAS, Aegis Investments I, L.L.C. (the "Company"), a limited liability company organized under the Delaware Limited Liability Company Act (the "Act"), was formed for the purpose of making and holding investments;

WHEREAS, the Company subsequently has changed its name to Aegis Investment Partners, L.L.C. (hereinafter referred to as the "Company");

WHEREAS, the Members desire that the Company expand its purpose to include managing and owning investments for it and on behalf of third parties;

WHEREAS, the Members have agreed to amend and restate the Company's Operating Agreement dated as of December 27, 1996;

WHEREAS, Daria E. Kane has agreed to withdraw as a Member of the Company in return for certain consideration;

WHEREAS, the Members desire to enter into this Amended Agreement with the intent of creating the methods and procedures by which the Company will operate.

THEREFORE, in consideration of the promises made herein, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Members, intending to be legally bound, hereby agree as follows:

### AMENDED AND RESTATED AGREEMENT

1.      **Certain Definitions.**

When used herein, the following terms (singular or plural depending on the context) shall have the meanings set forth below.

"**Act**" means the Delaware Limited Liability Company Act, 6 Del. C. §§18-101 et seq., as amended from time to time.

"**Adjusted Capital Account Deficit**" means, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant Fiscal Year, after giving effect to the following adjustments:  (a) credit to such Capital Account (i) any amount which such Member is obligated to restore pursuant to any provision of this Agreement, (ii) an amount equal to such Member's share of Company Minimum Gain and Nonrecourse Debt Minimum Gain as determined under Treas. Reg. 1.704-2(g)(1) and Treas. Reg. 1.704-2(i)(5) and (iii) any amount which such Member is deemed to be obligated to restore pursuant to Treas. Reg. 1.704-1(b)(2)(ii)(c); and (b) debit to such Capital Account the items described in subclauses (4), (5) and (6) of Treas. Reg. 1.704-1(b)(2)(ii)(d).  This definition is intended to comply with the provisions of Treas. Reg. 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

"**Advisory Fees**" means any and all monies, other than Performance Fees, received by the Company, Aegis Advisers or any Affiliate in connection with the provision of investment advisory services to third parties.

"**Aegis Advisers**" means Aegis Investment Advisers, L.L.C., a wholly owned limited liability company registered under the Investment Advisers Act of 1940, as amended, together with any of its related subsidiaries, if any.

"**Affiliate**" means any Person that directly or indirectly controls, is controlled by or is under common control with, the Company, together with the officers, directors and employees of all such Persons, and in the case of individuals, the spouse and children of all such Persons.  As used in the immediately preceding sentence, the term "**control**" means, with respect to a Person, the right to exercise a majority of the voting rights attributable to such Person, and the term "**majority**" means more than fifty percent (50%).

"**Amended Agreement**" means this Amended Operating Agreement, as the same may be amended and supplemented from time to time, and all Schedules, Exhibits and attachments hereto.

"**Board of Directors**" means the Board of Directors created pursuant to Section 8 of this Amended Agreement.

"**Business**" means the provision of consulting, investment advisory or asset management services on behalf of itself and to third parties with respect to making equity or equity-like investments in private businesses, or the making of senior and subordinated loans to private businesses.

"**Capital Account**" means the capital account of each Member established and maintained in accordance with Section 5(i).

"**Capital Contribution**" means, with respect to any Member, the amount of cash and/or the fair market value of the property actually contributed to the Company by such Member as determined on the date of contribution, including the common and preferred stock of Venture Vortex, Inc.

"**Carried Interest**" means any monies that the Company and any Affiliate receive in connection with Performance Fees as set forth in any investment advisory agreement involving Aegis Advisers, less any amount of Carried Interest received by Aegis Advisers and distributed by Aegis Advisers to its employees and management.

"**Carried Interest Distribution**" means for each Member the Carried Interest Percentage for each Member multiplied by the Carried Interest received by the Company.

"**Carried Interest Percentage**" means, for each Member, the percentage shown for that Member in Column G on the attached Exhibit A. In the event all or any portion of a Carried Interest in the Company is transferred in accordance with the terms of this Agreement or forfeited pursuant to an Employment Agreement, the transferee shall succeed to the Carried Interest Percentage of the transferee to the extent it relates to the transferred interest.

"**Certificate**" means the certificate of formation of the Company, and all amendments thereto, executed and filed pursuant to the Act and the terms of this Agreement.

"**Client**" shall mean, at any particular time, any Person who is, or, within six months prior to such time, had been an advisee, investment advisory customer, professional and consulting services customer or client of the Company or any Affiliate. In addition, this term shall include, at any particular time, any Person to whom the Member (indirectly or through any Person acting by arrangement with any other Member, the Company or any Affiliate, or at the direction of any other Member, the Company or any Affiliate) has, within six months prior to that time, offered (by means of a personal meeting or correspondence or a written proposal specifically directed to the particular Person) the services of the Company or any Affiliate but who is not at such time an advisee, investment advisory customer, professional and consulting services customer or client of the Company or any Affiliate. The preceding sentence is meant to exclude form letters and blanket mailings.

"**Code**" means the Internal Revenue Code of 1986, as amended. All references herein to specific Sections of the Code shall be deemed to refer also to the corresponding provisions of succeeding law.

"**Daria E. Kane Distribution**" means the payments to Daria E. Kane by the Company in the amount of $40,000, to be paid at a rate of $4,000 per month beginning March 2003 until fully repaid. Together with Exhibit H, such payments are in consideration for the withdrawal of Daria E. Kane as a Member of the Company.

"**Draw Note**" means the aggregate of cash flow promissory notes dated as of the date hereof made payable by the Company to the Draw Note Holders pursuant to Section 5(e) hereof. A copy of the Draw Note is attached hereto as Exhibit B.

"**Draw Note Holder**" means a Member, listed on the attached Exhibit C, who has agreed to provide funds to the Company through the Draw Note pursuant to Section 5 hereof.

"**Distributable Cash**" means all cash funds of the Company on hand from time to time (other than from Capital Contributions and from Carried Interest), after payment of or provision for (a) all Company costs and expenses that are due and payable as of such time; (b) all Company costs and expenses that are anticipated to become due and payable within ninety (90) days following the date on which Distributable Cash is being determined; and (c) such other liabilities and reasonable reserves of the Company as the Board of Directors determines are necessary or advisable.

"**Employment Agreement**" means the agreement between a Member who is an Officer of the Company or any Affiliate regarding the terms of his or her employment with the Company or any Affiliate, with specific reference to Incentive Ownership Interest as well as salary, bonus payments and Carried Interest.

"**Fiscal Period**" means the period commencing on the first day of each Fiscal Year, on each date next following the date of any retirement of any Member from the Company and on each date next following the date of admission of any member to the Company, and the prior Fiscal Period shall terminate on the date immediately preceding such date of commencement of a new Fiscal Period.

"**Fiscal Year**" means the time period set forth in Section 3(e) hereof.

"**Incentive Ownership Interest**" means for each Member, the percentage shown for that Member as listed in Column E on the attached Exhibit A.

"**Incentive Ownership Members**" means those Members listed on the attached Exhibit A who are entitled to Incentive Ownership Interests.

"**Majority-in-Interest**" means the affirmative vote by any combination of Members owning at least two-thirds of the total Percentage Interests in the Company.

"**Membership Interest**" means each Member's Capital Account, Percentage Interest, Incentive Ownership Interest, Carried Interest and Carried Interest Percentage.

"**Net Losses**" for any Fiscal Year means the excess, if any, of the items of loss and deduction over the items of income and gain of the Company as recorded on its financial accounting books and records for such Fiscal Year.

"**Net Profits**" for any Fiscal Year means the excess, if any, of the items of income and gain over the items of loss and deduction of the Company as recorded on its financial accounting books and records for such Fiscal Year.

"**Officer**" means any Person who is an officer of the Company or any Affiliate appointed or removed pursuant to Section 9(d) hereof.

"**Organizational Expenses**" means the fees, costs and expenses of, and incidental to, the organization of the Company.  Such expenses shall include any and all amounts categorized as "organizational expenditures" under the Code, including without limitation, expenditures for legal, accounting and professional fees incurred in connection with the formation of the Company, structuring and preparation of this Amended Agreement, organizational meetings and establishing the books and records of the Company.

"**Performance Fees**" are any and all monies, other than Advisory Fees, received by the Company, Aegis Advisers or any Affiliate in connection with the performance of investment advisory services provided to third parties pursuant to, and regulated by, the Investment Advisers Act of 1940.

"**Percentage Interest**" means for each Member, the percentage shown for that Member in Column F on Exhibit A.  In the event all or any portion of a Percentage Interest in the Company is transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Percentage Interest of the transferee to the extent it relates to the transferred interest.

"**Person**" means any individual, partnership, corporation, limited liability company, trust or other entity.

"**Priority I Distribution**" means the monies payable to those Members in the amounts and percentages listed in Column B on the attached Exhibit A.

"**Priority II Distribution**" means the monies payable to those Members in the amounts and percentages listed in Column C on the attached Exhibit A.

"**Priority III Distribution**" means the monies payable to those Members in the amounts and percentages listed in Column D in the attached Exhibit A.

"**Property**" means all of the property, real, personal or mixed, tangible or intangible, owned by the Company or in or to which the Company has any interest of any nature or description.

"**Securities Act**" means the Securities Act of 1933, as amended.

"**Subordinated Notes**" means the cash flow promissory notes made payable by the Company to the Subordinated Note Holders, pro rata, pursuant to Section 5(f)).  A copy of a Subordinated Note is attached hereto as Exhibit D.

"**Subordinated Note Holder**" means any Member listed on the attached Exhibit E who have provided funds to the Company in the form of the waiver of unpaid salaries, wages and reimbursement for other operating expenses.

Final                                                                                                    7/3/2003

"**Tax Matters Member**" means the Member of the Company so designated pursuant to Section 9(g).

"**Treas. Reg.**" and "**Regulations**" mean the Income Tax Regulations promulgated under the Code, as such regulations may be amended from time to time (including corresponding provisions of succeeding regulations).

"**Venture-Vortex**" means Venture-Vortex, Inc., a Delaware corporation, which is an Affiliate.

2.      <u>Organization</u>.

(a)      <u>Formation</u>. The Members hereby agree to own and continue operations of the Company as a limited liability company pursuant to the provisions of the Act and upon the terms and conditions set forth in this Amended Agreement.

(b)      <u>Name</u>. The name of the Company is "**Aegis Investment Partners, L.L.C**".

3.      <u>Principal Place of Business; Registered Office; Fiscal Year and Fiscal Periods</u>.

(a)      <u>Principal Place of Business</u>.   The principal place of business of the Company will be located at 4600 South Syracuse Street, Suite 1080, Denver, Colorado 80237, or at such other place as the Managing Member may determine from time to time.  Notification of any such change shall be given to all of the Members.

(b)      <u>Registered Office</u>.   The address of the Company's registered office in Delaware is The Company Corporation, and its initial registered agent for service of process is 1313 North Market Street, Wilmington, Delaware 19801.  The Managing Member may designate a different address of the Company's registered office and a different registered agent by amending the Certificate in accordance with the Act.

(c)      <u>Fiscal Year and Fiscal Periods</u>.  The fiscal year of the Company shall end on December 31 of each year, subject to change by the Managing Member.

4.      <u>Purposes and Powers of the Company</u>.

(a)      <u>General Purposes and Powers</u>.  The Purpose of the Company is to provide investment and asset management advisory services on behalf of itself and for third parties and to carry on any lawful business, purpose or activity relating to the foregoing.

(b)      <u>Additional Powers</u>.    The Company shall have and may exercise all of the powers that may be possessed and exercised by a limited liability company under the Act.

Final                                                                                                    7/3/2003

5.    Capital Contributions and Capital Accounts.

(a)    **Capital Contributions.** A schedule of the initial Capital Contribution by each of the Members is listed in Column A on the attached Exhibit A. The Members hereby agree and acknowledge that portions of the Capital Contributions represent preferred stock and common stock in Venture-Vortex.

(b)    **Additional Capital Contributions.** Members may be requested to make additional contributions to the capital of the Company on any date or dates so selected by the Board of Directors. Any such requests shall be made at the direction of the Board of Directors and subject to consent by a Majority-in-Interest. Any Member who does not satisfy his or her proportionate share of the additional capital contribution shall have a proportionate reduction in his or her percentage share with respect to the return of all Capital Contributions, Percentage Interest and Carried Interest Percentage. Under no circumstances shall a Member be required to make any additional Capital Contributions to the Company.

(c)    **Repayment of Capital Contributions.** Except as expressly provided in this Amended Agreement, no specific time has been agreed upon for the repayment of Capital Contributions or Capital Accounts, and no Member (or its successor in interest) shall have the right to withdraw any part of his or her Capital Contribution or Capital Account or to receive any distribution from the Company, except as set forth pursuant to Section 6(e) hereof.

(d)    **No Interest; No Withdrawal.** Except as otherwise instructed by the Board of Directors, no interest shall be paid by the Company on Capital Contributions or Capital Accounts. Except as expressly provided in this Amended Agreement, no Member shall have the right to receive property other than cash in return for his or her Capital Contribution or Capital Account.

(e)    **Draw Note.** The Members acknowledge that, contemporaneous with the execution of this Amended Agreement, the Company has executed and delivered to each Draw Note Holder a Draw Note, which in the aggregate total an original principal amount of $375,000 made payable by the Company to the Draw Note Holders. Unless an "Event of Default" has occurred as described in the Draw Note, each Draw Note Holder shall advance to the Company amounts pursuant to the Draw Note or as determined by the Managing Member, at the direction of the Board of Directors in a manner set forth in Section 5(g) hereof.

(f)    **Subordinated Note.** The Members acknowledge that, contemporaneous with the execution of this Amended Agreement, the Company has executed and delivered to each Subordinated Note Holder a Subordinated Note, which in the aggregate total an original principal amount of $264,875 made payable by the Company to the Subordinated Note Holders, pro rata, in a manner set forth in Section 6(e).

(g)    **Operating Advances.** In the event that the Board of Directors determines that the Company requires additional capital to pay operating expenses, including without

limitation, legal, accounting or other professional fees and expenses incurred by the Company, the Managing Member shall notify the holders of the Draw Note. Within ten (10) business days after receipt of such notice, the Draw Note Holders shall advance a proportionate share of such sums to the Company as an operating advance (an "Operating Advance"). The Company shall repay each Operating Advance, together with accrued and unpaid interest, to the Draw Note Holders, pro rata, pursuant to Section 6(e) hereof and in accordance with the terms and conditions of the Draw Note.

(h)  **Additional Capital During and After Current Fiscal Year.**  The Members hereby acknowledge and agree that it is anticipated that the Company may operate at a loss during the current Fiscal Year (ending December 31, 2003), and therefore the Draw Note Holders have agreed to make advances to the Company under the Draw Note in accordance with the procedures set forth in Section 5(e) hereof.  The Members further hereby acknowledge and agree that the Company anticipates receiving and making those expenditures set forth in the pro-forma budget attached hereto as Exhibit F.  It is anticipated that a sufficient amount of revenue will be generated from the Company's business during the current Fiscal Year to fund a portion of the Company's expenditures estimated for the current Fiscal Year; however, the Members further acknowledge and agree that if such level of revenue is not generated, the Board of Directors will, in good faith and as part of the performance of their duties set forth in Section 5(g), reassess the Company's level of anticipated expenditures, on a bi-monthly basis for the remaining current Fiscal Year.

(i)  **Capital Accounts.**

(i)  There shall be established and maintained for each Member on the books of the Company a Capital Account initially reflecting an amount equal to his or her Capital Contribution.  The Capital Accounts shall be adjusted from time to time to reflect the Members' additional Capital Contributions, allocable shares of Net Profits or Net Losses or any item thereof, special allocations, distributions and as otherwise required by the provisions of this Agreement and the Code and Regulations, including, but not limited to, the rules of Treas. Reg. 1.704-1(b)(2)(iv).

(ii)  If allocations are required pursuant to Section 6(e)(ii) or 6(e)(iii), then the adjustments to the Capital Accounts of the Members in respect of the property described therein shall be made in accordance with Treas. Reg. 1.704-1(b)(2)(iv)(g) for allocations to them of items of income, gain, loss and deduction (including depreciation, depletion, amortization and other cost recovery) as computed for book purposes, and no further adjustments shall be made to the Capital Accounts to reflect the Members' shares of the corresponding tax items.  For purposes of computing such adjustments to the Capital Accounts, the Managing Member will utilize the method of computing depreciation, depletion or amortization with respect to such property as is utilized for federal income tax purposes except that the property's value for book purposes will be used rather than its adjusted tax basis.

(iii)  For purposes of maintaining Capital Accounts when Company property is distributed in kind, the Company shall treat such property as if it had been sold for its fair market value (taking into account Section 7701(g) of the Code) on the date of distribution,

and each Member receiving such distribution shall have its Capital Account debited by the fair market value (without taking into account Section 7701(g) of the Code) of the property distributed to such Member.

6.      **Allocations and Distributions.**

(a)      **General.**   Items of Company income, gain, loss and deduction shall be allocated to the Capital Accounts of the Members in accordance with this Section 6.

(b)      **Allocation of Company Income and Loss.**   Company Income and Loss for each fiscal year shall be allocated to the Capital Account of all Members in proportion to their respective Percentage Interests.

If a disparity exists between the amounts distributed or to be distributed to each Member pursuant to Section 6(e) and the amounts previously allocated pursuant to this Section 6(b), subsequent allocations of Net Profits shall be made in a manner which, to the greatest extent possible, eliminates such disparity.

(c)      **Income Tax Allocations.**

(i) Except as otherwise required by the Code and the rules and Treasury Regulations promulgated thereunder, a Member's distributive share of the Company's income, gain, loss, deduction, or credit for income tax purposes shall be the same as is entered in the Member's Capital Account pursuant to this Agreement.

(ii)  If property is contributed to the Company by a Member and there is a difference between the basis of such property to the Company for federal income tax purposes and the fair market value at the time of its contribution, then items of income, gain, loss and deduction with respect to such property as computed for federal income tax purposes (but not for book purposes) shall be shared among the Members so as to take account of such difference as required by Code Section 704(c).

Net Losses allocated to each Member pursuant to the this Section 6(c) shall not exceed the maximum amount that can be so allocated without causing such Member to have an Adjusted Capital Account Deficit at the end of any Fiscal Year.  All Net Losses in excess of the limitation ("Excess Losses") set forth in the preceding sentence shall be reallocated to the other Members in proportion to their respective Percentage Interests.  In the event of any such reallocation of Excess Losses, subsequent allocations of Net Profits (or any item thereof) in an amount sufficient to offset the allocation of such Excess Losses shall be made to the Members receiving such allocation of Excess Losses prior to any other allocations of Net Profits being made pursuant to Section 6(b).

(d)      **Regulatory Allocations.**

(i)      If a Member receives any adjustments, allocations, or distributions described in subclauses (4), (5) or (6) of Treas. Reg. 1.704-1(b)(2)(ii)(d), items of Company income and gain shall be specially allocated to such Member in an amount and manner sufficient to eliminate, to the extent required by the Regulations, the Adjusted Capital Account Deficit of such Member as quickly as possible, provided that an allocation pursuant to this subsection shall be made only if and to the extent that such Member would have an Adjusted Capital Account Deficit after all other allocations provided for in this Section 6 have been tentatively made as if this subsection were not in this Agreement.

(ii)      To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Section 734(b) of the Code or Section 743(b) of the Code is required pursuant to Treas. Reg. 1.704-1(b)(2)(iv)(m)(2) or with respect to a distribution to a Member in liquidation of such Member's interest in the Company, pursuant to Treas. Reg. 1.704-1(b)(2)(iv)(m)(4) to be taken into account in determining Capital Accounts, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis), and such gain or loss shall be allocated to the Members in accordance with their interests in the Company, in the event Treas. Reg. 1.704-1(b)(2)(iv)(m)(2) applies, or to the Member to whom such distribution is made, in the event Treas. Reg. 1.704-1(b)(2)(iv)(m)(4) applies.

(iii)      If property of the Company (other than property described in Section 6(d)(ii) above) is reflected in the Capital Accounts of the Members and on the books of the Company at a book value that differs from the adjusted basis of such property for federal income tax purposes by reason of a revaluation of such property, then items of income, gain, loss and deduction with respect to such property for federal income tax purposes (but not for book purposes) shall be shared among the Members in a manner that takes account of the difference between the adjusted basis of such property for federal income tax purposes and its book value in the same manner as differences between adjusted basis and fair market value are taken into account in determining the Members' shares of tax items under Code Section 704(c).

(e)      <u>Distributions</u>.

(i)      <u>Distributable Cash</u>.   Except as otherwise provided in Section 15 relating to liquidation of the Company, the Managing Member shall distribute Distributable Cash not less frequently than once per Fiscal Year.   All Distributable Cash shall be applied, first, to repayment of the Draw Note, second, to repayment of the Subordinated Notes, third, to payment of the Priority I Distribution, fourth, to payment of Priority II Distribution, fifth, to the extent Distributable Cash relates to a sale of the Company or its assets, to payment of Priority III Distribution, sixth, to return of all other Capital Contributions on a pro rata basis, and, seventh, to the Members in accordance with each Member's Percentage Interest.

(ii)      <u>Carried Interest</u>.   Except as otherwise provided in Section 15 relating to liquidation of the Company, the Managing Member shall distribute Carried Interest not less frequently than once per Fiscal Year as a Carried Interest Distribution.

Final                                                                                                7/3/2003

(iii)    If a Member receives a distribution that is in excess of the amount that he or she is entitled to receive under this Section 6(e), as determined after taking into account all distributions made during the Fiscal Year in which such distribution was made, such Member shall be required to restore the excess portion of such distribution to the Company as soon as practicable but in no event later than thirty (30) days following the end of the Fiscal Year in which such distribution was made; provided, however, that no Company creditor may rely on this sentence in order to create an obligation of a Member to pay a Company debt which such Member is not otherwise personally obligated to pay.

(iv)    Anything in this Section 6(e) to the contrary notwithstanding, no distribution shall be made to any Member if, and to the extent that, such distribution would not be permitted under the Act or under agreements by which the Company is bound.  Each Member, by becoming a Member, consents to the making or omission of any such distribution hereafter to the Members in accordance with this Section 6(e).

7.    **Books of Account; Reports.**

(a)    **Books of Account**.  The Company's books and records shall be maintained at the principal office of the Company or at any other location designated by the Managing Member, and all Members shall have access thereto at all reasonable times.  The Managing Member shall cause the books and records to be kept in reasonable detail and in accordance with the basis of accounting used for federal income tax purposes, and otherwise in a manner which accurately and fairly reflects the financial position and operations of the Company and is adequate for the conduct of the Company's business.

(b)    **Reports**.

(i)    Within ninety (90) days after the end of each Fiscal Year, the Company shall prepare and submit to each Member an annual report of the Company for such Fiscal Year.  The annual report shall include the balance sheet of the Company as of the last day of such Fiscal Year and statements of profit or loss and cash flows of the Company for such Fiscal Year.  The report shall be accompanied by a supplementary schedule showing the entries to the Members' (separately and in the aggregate) Capital Accounts in respect of such Fiscal Year, together with the appropriate Internal Revenue Service forms showing entries required to be made on each Member's federal income tax return with respect to the Company's Net Profits or Net Losses.

(ii)    In connection with the liquidation and dissolution of the Company, the Managing Member shall prepare and submit to the Members a termination report containing the financial statements of the Company as of and for the period ended upon the substantial completion of liquidation.

8.    **Management of the Company.**

(a)   **Board of Directors**.  The Members desire that a Board of Directors be created to supervise the affairs of the Company and the Managing Member.   The Board of Directors shall consist of five (5) Directors, each of whom shall be subject to election and removal by the affirmative vote and written consent of the Majority-in-Interest.   The Board of Directors may increase the number of Directors and fill any vacancy on the Board of Directors by the affirmative vote and written consent of the Majority-in-Interest.

(b)   **Designation of Directors**.   The Directors shall be Thomas F. Kane, Jr., Garnet S. Heraman, Michael R. Webb, Raymond L. Britt, Jr., and Christopher R. O'Toole.

(c)   **Roles and Duties**.   The Managing Member shall report to and inform the Board of Directors on a regular basis and shall seek the approval of the Board of Directors on all issues that are material to the Company.  Without limiting the foregoing, the Members intend that the Board of Directors shall:

(i)   Review and approve any capital financing, sale, merger, acquisition, dissolution, asset liquidation or other business combination involving the Company, any Affiliate or a significant portion of the assets thereof;

(ii)   Review and approve the budget, expenditures made outside of the budget, distributions, allocations, tax elections, banking matters, including the opening of bank accounts for the Company and Affiliates, accounting procedures and all other material events;

(iii)   Review and approve the methodology used by the Managing Member to value the assets of the Company or Affiliates;

(iv)   Review and approve the appointment of Executives, as that term is used in any Employment Agreements entered into by the Company or Affiliates;

(v)   Review and approve the elimination of Incentive Ownership Interest for any Member who is both an Officer of the Company or Affiliate and an Incentive Ownership Member.

Except as otherwise provided in this Amended Agreement, the provisions that govern the manner of actions of the Board of Directors, including, but not limited to, the required number of votes to act, the necessity to obtain a quorum at a meeting, and the ability to act without a meeting shall be the same as the provisions that govern the manner of acting of a board of directors of a corporation incorporated in the State of Delaware, as such provisions are set forth in the General Corporation Law of Delaware.

(d)   **Limitations on Activities**.  Except as otherwise required by law, the Board of Directors shall not have the power to bind the Company or any authority to act for the Company or on its behalf.

(e)    **Meetings**.  The Board of Directors shall meet at such times and from time to time as the Managing Member may determine, but at least on a quarterly basis per Fiscal Year. In addition, any Member may call a meeting of the Board of Directors at any time.  The Managing Member shall provide written notice to Directors of the Board of Directors of any meeting at least 10 days in advance of the meeting.

9.    **Managing Member.**

(a)    **Appointment**.  There shall be at all times one Managing Member of the Company.  The Board of Directors, subject to the affirmative vote of the Majority-in-Interest, shall have the power to elect and remove for Cause as defined in Section 13(d) hereof the Managing Member.  Unless specified otherwise in this Amended Agreement, the Managing Member shall have the sole authority to make decisions concerning the day-to-day affairs of the Company, take actions on behalf of the Company to legally bind the Company, and appoint or remove all Persons appointed as directors by the Company to or from the Board of Directors of any Affiliate.  The Managing Member shall have the titles of President and Managing Member.  As of the effective date of this Amended Agreement, Thomas F. Kane, Jr. is hereby designated as the Managing Member.

(b)    **Determination of the Managing Member**.  Unless specified otherwise in this Amended Agreement, all matters concerning allocations, distributions and tax elections (except as may otherwise be required by the income tax laws) and accounting procedures not expressly and specifically provided for by the terms of this Amended Agreement shall be determined in good faith by the Managing Member. Such determinations shall be final and conclusive as to all the Members.

(c)    **Restrictions on the Members.**  Other than a Member acting in such Member's capacity as Managing Member, Officer or Director under the terms of this Amended Agreement, the Members shall take no part in the control or management of the Company's business nor shall the Members have any power or authority to act for or on behalf of the Company.  Except as expressly provided herein or as required by the law, the Members shall have no right to vote on any Company matters.

(d)    **Title Designations**.  Unless specified otherwise in this Amended Agreement, the Managing Member shall have the power to create such employee or officer-type designations (such as president, vice-president and the like) as it shall determine to be in the best interests of the Company, to designate the powers, authorities and responsibilities as shall be deemed to have been granted to and undertaken by those individuals to whom such designations are assigned and to determine those individual(s) to whom such designations (and the accompanying powers, authorities and responsibilities) shall be assigned.  Except as may be limited by contract, each individual who is assigned any such designation shall serve at the pleasure of the Company, and any such designation (and the accompanying powers, authorities and responsibilities) may be modified or terminated at any time in the sole discretion of the Managing

Final                                                                                                              7/3/2003

Member.  Contemporaneously with the execution of this Amended Agreement, each Member who is an Officer of the Company or any Affiliate shall execute an Employment Agreement.

       (e)       <u>Liability and Indemnification</u>.

       (i)       Neither the Managing Member, Officers, Directors nor any other Members shall be liable to the Company or to any other Member for any debts owed by the Company to any such Member, or for any actions taken or omissions made in good faith and reasonably believed by the Managing Member, the Directors or any other Member to be in the best interests of the Company, or for errors of judgment, except to the extent such acts or omissions constitute reckless or willful misconduct.

       (ii)       To the fullest extent permitted by law, the Company shall indemnify the members of the Board of Directors and the Managing Member (and each of the partners, employees, agents and Affiliates of the members of the Board of Directors, Managing Member and each of the Members, where acting for or as agent of the Company or the Managing Member in its capacity as such; any of the foregoing Persons being hereinafter an "**Indemnified Person**") and save and hold them and each of them harmless from and in respect of (A) all fees, costs and expenses, including attorneys' fees, incurred in connection with, or resulting from, any claim, action or demand against any such Indemnified Person or the Company which arise out of, or in any way relate to, the Company, its properties, business or affairs, and (B) all such claims, actions and demands and any losses, liabilities or damages resulting therefrom, including amounts paid by such Indemnified Person with the prior written consent of the Company in settlement or compromise of any such claim, action or demand; <u>provided</u>, <u>however</u>, that this indemnity shall not extend to any such Indemnified Person to the extent that its acts and omissions shall have been adjudged to constitute reckless or willful misconduct.

       (iii)       The Company, at the discretion of the Managing Member, shall advance monies of the Company to any Indemnified Person who is or may be subject to a claim for which indemnification may be required under this Section 9(e) to cover attorneys' and accountants' fees and disbursements and other similar defense costs or expenses.  Such advances may be conditioned by the Managing Member upon satisfaction of such conditions as the Managing Member in its discretion determines are appropriate, including, but not limited to, either or both of (A) an undertaking by the Indemnified Person to return monies so advanced if it is ultimately determined that indemnification is not required under this Section and (B) a determination by independent counsel that such Indemnified Person is more likely than not to be entitled to indemnification under this Section 9(e).  Furthermore, no monies shall be advanced under this Section 9(e) if the making of such advance would, in the reasonable judgment of the Managing Member, render the Company insolvent or impair its ability to discharge its other obligations, whether or not accrued, absolute, fixed or contingent, or would interfere with its ability to carry out the purposes of the Company.

       (iv)       The right of any Indemnified Person to the indemnification provided herein shall be cumulative of, and in addition to, any and all rights to which such

Final                                                                                                        7/3/2003

indemnified person may otherwise be entitled by contract or as a matter of law or equity and shall extend to such Indemnified Person's successors, assigns and legal representatives.

(f)     **Banking**.  Unless specified otherwise in this Amended Agreement, all funds of the Company shall be deposited in such bank account or other financial accounts as shall be determined by the Managing Member.  Such funds shall not be commingled with any of the funds of any Member or Affiliate.

(g)     **Tax Matters Member**.  To the extent necessary, the Managing Member shall be the "tax matters partner" (as defined in Code Section 6231(a)(7)) to act on behalf of the Company and its Affiliates in connection with Company income tax matters.

   10.    **Other Activities of the Members and Non-competition; Investment Representations.**

(a) **Other Activities**.  Nothing in this Amended Agreement shall preclude any Member who is an Officer, Director or employee of the Company or any Affiliate (for purposes of Section 10 only, "Executive") from engaging in other transactions and possessing interests and making investments in and loans to other business ventures of any nature or description not competitive with the Business of the Company and any Affiliate, independently or with others, whether existing as of the date hereof or hereafter coming into existence, and neither the Company nor any Affiliate nor any other Member shall have any rights in or to any such other transactions, investments or ventures or the income or profits derived therefrom.

(b) **Covenant Not To Compete.**

(i)    **Scope of Covenant**. Each Executive covenants and agrees that for a period equal to two (2) years commencing upon the expiration or termination of the Executive's employment with the Company or any Affiliate (for any reason whatsoever), the Executive shall not, directly or indirectly, for himself or on behalf of or in conjunction with any other Person without the prior written consent of the Company:

(A.)    Engage, as an officer, director, shareholder, owner, partner, joint venturer, or in a managerial capacity, whether as an employee, independent contractor, consultant or adviser, or as a sales representative, in any business selling any products or services in direct competition with the Company and any Affiliate within the United States (the "Territory");

(B.)    Call upon any Person who is at that time, or who was at any time within one (1) year prior to that time, an employee of the Company or any Affiliate in a managerial capacity for the purpose or with the intent of enticing such employee away from or out of the employ of the Company or any Affiliate provided that the Executive shall be permitted to call upon and hire any member of his immediate family;

(C.)    Call upon any Person who is, at that time, or who has been, within one (1) year prior to that time, a Client or an investment of the Company or any Affiliate

-16-

within the Territory for the purpose of soliciting or selling products or services in direct competition with the Company or any Affiliate within the Territory; or,

> (D.)    Call upon any prospective acquisition candidate, on the Executive's own behalf or on behalf of any competitor, which candidate was either called upon by the Company or any Affiliate or for which the Company or any Affiliate made an acquisition analysis, for the purpose of acquiring such entity;

For purposes of this Amended Agreement,

> (ii)    <u>Reasonableness.</u> It is agreed by the parties that the foregoing covenants in this Section 10 impose a reasonable restraint on the Executive in light of the activities and business of the Company and any Affiliate on the date of the execution of this Amended Agreement and the current plans of the Company or any Affiliate; but it is also the intent of the Company and the Executive that such covenants be construed and enforced in accordance with the changing activities, business and locations of the Company (including Affiliates) throughout the term of this covenant.

> (iv)    <u>Severability.</u> The covenants in this Section 10 are severable and separate, and the unenforceability of any specific covenant shall not affect the provisions of any other covenant.  Moreover, in the event any court of competent jurisdiction shall determine that the scope, time or territorial restrictions set forth are unreasonable, then it is the intention of the parties that such restrictions be enforced to the fullest extent that the court deems reasonable, and this Amended Agreement shall thereby be reformed.

> (v)    <u>Enforcement by the Company Not Limited.</u> All of the covenants in this Section 10 shall be construed as an agreement independent of any other provision in this Amended Agreement, and the existence of any claim or cause of action of the Executive against the Company or any Affiliate, whether predicated on this Amended Agreement or otherwise, shall not constitute a defense to the enforcement by the Company or any Affiliate of such covenants.  It is specifically agreed that the period of two (2) years stated at the beginning of this Section 10, during which the agreements and covenants of the Executive made in this Section 10 shall be effective, shall be computed by excluding from such computation any time during which the Executive is in violation of any provision of this Section 10.

> (vi)    <u>Change of Relevant Law.</u> Notwithstanding any of the foregoing, if any applicable law shall reduce the time period during which the Executive shall be prohibited from engaging in any competitive activity described in Section 10(b)(1) hereof, the period of time for which the Executive shall be prohibited from engaging in competitive activities pursuant to Section 10(b)(1) hereof shall be the maximum time permitted by law.

> (c)    <u>**Investment Representations.**</u>

Final                                                                                            7/3/2003

(i)     Each Member has acquired its Membership Interests purchased hereunder for its own account with the present intention of holding such securities for investment purposes and with no intention of selling such securities in violation of federal securities laws or any applicable state securities laws.

(ii)    Each Member has had an opportunity to ask questions and receive answers concerning the terms and conditions of the Membership Interests purchased hereunder and the transactions contemplated hereby and has had full access to such other information concerning the Company as such Member may have requested and that in making its decision to invest in the Membership Interests being purchased hereunder it is not in any way relying on the fact that any other Person has decided to be a Member hereunder or to invest in the Membership Interests.

(iii)   Each Member (A) is an "accredited investor" as defined in Rule 501(a) under the Securities Act or (B) by reason of such Member's business and financial experience, and the business and financial experience of those retained to advise such Member with respect to his investment in the Membership Interests being purchased hereunder, such Member , together with such advisers, has such knowledge, sophistication and experience in business and financial matters so as to be capable of evaluating the merits and risks of its prospective investment in such Membership Interests, is able to bear the economic risk of such investment and, at the present time, is able to afford a complete loss of such investment.

11.    <u>Expenses and Fees.</u>

(a)     <u>Operating Expenses</u>.  The Company shall be obligated to pay or reimburse the expenses of operating and maintaining the Company and its Property, which expenses shall include, without limitation, legal, accounting and auditing fees and expenses of the Company and the costs of the acquisition, maintenance, repair and disposition of the Company's Property and taxes and assessments with respect thereto.

(b)     <u>Compensation</u>.  The Company shall be obligated to pay Members who are Officers or employees of the Company or any Affiliate a salary, fee or draw for services rendered to or on behalf of the Company, only as stipulated in each Member's employment agreement, if any, or as otherwise agreed to by the Board of Directors.

12.    <u>Transfers of Interests; Admission; Death of a Member.</u>

(a)     <u>Transfer Restrictions</u>.  Except as expressly set forth in this Amended Agreement or the attached Exhibit H, no Member holding Membership Interests hereunder may pledge, hypothecate, grant an option on or a security interest in or otherwise encumber, or sell, transfer, or otherwise dispose of, either voluntarily or by operation of law, any interest in any of its Membership Interests without the prior written consent of the Managing Member.  Any transfer of any Membership Interests, or any interest therein, in violation of this Agreement shall be void and of no effect.  The Company shall not cause or permit the transfer of any Membership Interests to

be made on its books unless the transfer is permitted by this Agreement and has been made in accordance with its terms.

(b)     Restrictions Applicable to All Transfers.  All Transfers, except for estate planning purposes, shall be subject to the following:

(i)     Prior to transferring any Membership Interests to any Person, the transferring Member shall cause the prospective transferee to execute and deliver to the Company and the other Members a joinder to this Agreement, whereupon such holder shall be deemed a "Member" hereunder, and shall have all the rights, privileges and obligations of a "Member" as are set forth herein.

(ii)     The prospective transferee shall acknowledge in writing that the Membership Interests have not been registered under the Securities Act or any applicable state securities laws, and may not be transferred in the absence of an effective registration statement under such laws except pursuant to an exemption from such laws.  If Membership Interests are being transferred pursuant to such an exemption, then the transferring Member shall give prior written notice of such exemption to the Company and the Company may request an opinion of the transferring Member's counsel as to the availability of such exemption, which opinion and counsel shall be reasonably satisfactory to the Company.

(c)     Additional Members; Other Holders of Membership Interests; Admissions and Removals.

(i)     The Board of Directors shall have the power and authority at any time or from time to time:

(A)     To create such additional classes or groups of members having such relative rights, powers and duties, including rights, powers and duties equal or junior to existing Members or classes of Members; and

(B)     Whether or not in connection with Section 12(c)(i)(A), (1) to designate one or more Persons to whom Membership Interests (and the number thereof) may be issued; and (2) to designate one or more Persons for admission as a Member and, in connection therewith, to determine the amount, the time or times at which shall be made, and the nature of, such Person's Capital Contribution, the number of Membership Interests or other interest in the Company to which such Person shall be entitled, and all other terms and conditions of such Person's admission as a Member.

(ii)     A Person to whom Membership Interests are issued shall be entitled only to receive the allocations and distributions associated with such Membership Interests, and such Person shall become a Member, and shall have the right to participate in the management of the business and affairs of the Company, only if (A) such Person executes and acknowledges such instruments as the Company reasonably deems necessary or advisable to permit such Person to

Final                                                                                              7/3/2003

become a Member; and (B) all other steps are taken which, in the opinion of the Company, are reasonably necessary to permit such Person to become a Member.

    (iii)  Each Member hereby consents to (A) the issuance to any Person of Membership Interests or other interests herein; and (B) the admission to the Company of any additional member in accordance with the prior provisions hereof.

    (d)  <u>Death of a Member</u>.  In the event of the death of a Member, the Company shall have the right, but not the obligation, to purchase that Member's interest in the Company at Fair Market Value, as Fair Market Value is defined in Section 13(d) hereof.

    (e)  <u>Distributions and Allocations in Respect of Transferred or New Membership Interests</u>.  If any Membership Interests, or any interest therein, are sold, assigned, transferred or issued, or any Person otherwise becomes a Member during any Fiscal Year in compliance with the provisions of this Section 12, Net Profits, Net Losses, each item thereof, and all other items attributable to such Membership Interests, or interest therein, for such Fiscal Year shall be allocated among the Members by taking into account their varying interests during such Fiscal Year in accordance with Section 706(d) of the Code.  Unless otherwise required by the Regulations, such sale, assignment, transfer, issuance or admission shall be deemed to have occurred at the end of the calendar month during which such event shall have actually occurred, and such allocations shall be determined and made pursuant to a <u>pro forma</u> closing of the books of the Company as of the end of such month.  With respect to a transferred Membership Interest, or any interest therein, all distributions on or before the deemed date of such transfer shall be made to the transferor and all distributions thereafter shall be made to the transferee.  Neither the Company nor the Managing Member shall incur any liability for making allocations and distributions in accordance with the provisions of this Section 12(d).

    (f)  <u>Section 754 Election</u>.  Upon the transfer of any Membership Interests in the Company (or any interest therein), the Company may elect, in the sole discretion of the Managing Member, to make an election under Section 754 of the Code.

  13.  <u>Forfeiture; Restricted Interests.</u>

    (a)  Subject to Section 12 above, any Member who is both an Officer of the Company or any Affiliate and is subject to an Incentive Ownership Interest shall have the right to sell to the Company, but the Company shall not have the obligation to purchase from such Member, his or her Incentive Ownership Interests ("Restricted Interest") at their Fair Market Value, as defined in Section 13(c) below if the relationship or employment of such Member with the Company or any Affiliate is terminated by the Company, pursuant to Section 8(c)(v) of this Amended Agreement, without Cause or terminates as a result of: (i) the resignation of such Member due to a material breach by the Company of the Company's obligations to such Member pursuant to such Member's Employment Agreement, if any; or, (ii) the retirement of such Member upon or after reaching the age of 55; (iii) termination of such Member's Employment Agreement, if any.  One-third of the Restricted Interests of each Member so entitled to hold and own such

7/3/2003

interests shall no longer be subject to the provisions of this Section 13(a) upon each of the first three anniversaries following the date of execution of this Amended Agreement.

(b)    The Company shall have the right to purchase from a Member, and such Member shall have the obligation to sell to the Company, the Restricted Interests, less any Incentive Interests that are no longer subject to the provisions of Section 13(a), (but not less than all) of such Member's Restricted Interests:

(i)    at the Fair Market Value of the interests to be purchased if the Member's relationship or employment with the Company or any Affiliate is terminated as a result of: (A) the termination by the Company or any Affiliate without Cause, (B) the resignation of such Member due to a material breach by the Company of the Company's obligations to such Member pursuant to such Member's Employment Agreement, if any; (C) the retirement of such Member upon or after reaching the age of 55; or, (D) the Member's legal and involuntary incapacity if, as a result of Member's incapacity due to physical or mental illness or injury, Member shall have been unable to perform adequately his or her duties as provided herein for one-hundred and eighty (180) days in any twelve (12) month period;

(ii)    at the lesser of the Fair Market Value and the value paid for the interests to be purchased if such Member's relationship or employment with the Company or any Affiliate is terminated by the Company or any such affiliate for Cause;

(iii)    at the Fair Market Value or the value paid for the interests to be purchased, in the sole discretion of the Board of Directors (excluding any Director who is so selling his or her interests), if such Member's relationship with the Company or any Affiliates is terminated for any reason other than as a result of an event described in subsection (i)(A), (i)(B), (i)(C), (i)(D) or in subsection (ii) of the Section 13(b).

(c)    **Fair Market Value**.  The "Fair Market Value" of any interests being purchased or sold to the Company pursuant to this Section 13 shall be (i) the fair market value of all interest of the Company taken as a whole, without additional premiums for control or discounts for minority interests or restrictions on transfer, multiplied by (ii) the Percentage Interests.  The Fair Market Value of any interest shall be calculated with reference to the most recent appraisal, if any, and as of the most recent appraisal date, if any, prior to termination of the relevant Member's relationship or employment, or death of a Member.

(d)    **Cause**.  For purposes of this Amended Agreement, the term "Cause" shall mean:

(i)    Member's attempt to sell, transfer, or pledge any of his or her Membership Interests to any Person or in any manner prohibited by law or by the Company's Articles of Incorporation, By-Laws, this Amended Agreement or any corporate resolution of the Company;

Final                                                                                                    7/3/2003

          (ii)      Member's conviction of, or plea of nolo contendere, to a felony or crime involving moral turpitude;

          (iii)     Member's commission of an act of personal dishonesty or breach of fiduciary duty involving personal profit in connection with Member's employment by the Company;

          (iv)     Member's commission of an act which the Board of Directors by a vote of at least two-thirds, and which the Managing Member must be in the majority thereof, shall have found to have involved willful misconduct or gross negligence on the part of the Member in the conduct of his duties;

          (v)      Habitual absenteeism, chronic alcoholism or any other form of addiction or substance abuse on the part of the Member which prevents him or her from performing the essential functions of his or her position with or without reasonable accommodation.

     **14.**    <u>**Dissolution of Company.**</u>

          (a)     The Company shall dissolve upon the occurrence of any of the following events:

          (i)      the written agreement of the Majority-in-Interest and the Managing Member;

          (ii)      subject to Section 14(b) below, the death, retirement, resignation, expulsion, bankruptcy or dissolution of a Member or the occurrence of any other event which terminates the continued membership of a Member in the Company;

          (iii)     the sale of all or substantially all the assets of the Company;

          (iv)     the entry of an order of judicial dissolution under the Act; or

          (v)      the entry of a final judgment, order or decree of a court with competent jurisdiction adjudicating the Company to be bankrupt, and the expiration of the period, if any, allowed by applicable law in which it can appeal therefrom.

          (b)     An event described in Section 14(a)(ii) shall not cause the Company to dissolve if the business of the Company is continued with the consent of the Board of Directors within ninety (90) days after the date of such event. All Members hereby consent to the continuation of the business of the Company in the event that any event described in Section 14(a)(ii) occurs with respect to a Member.

     **15.**    <u>**Winding Up of the Company.**</u>

(a)    <u>Termination of Company Business</u>.  Upon dissolution of the Company as provided in Section 14, the Company shall cease to conduct its activities, and its business and affairs shall be wound up as promptly as practicable in conformity with the procedures herein set forth and the requirements of the Act.  The Company itself shall not terminate, however, until its debts, liabilities and obligations have been paid or provided for and its assets have been distributed.

(b)    <u>Liquidation of Assets</u>.  Upon dissolution of the Company, the Managing Member (the "**Liquidation Representative**") shall arrange for liquidation of the Company's assets and cause such liquidation to be carried out as promptly as is consistent with realization of maximum value.  The Liquidation Representative shall have full power and authority to:

(i)    sell, at such prices and upon such terms as the Liquidation Representative, in its sole discretion, may deem appropriate, any or all of the Company's assets; <u>provided</u>, <u>however</u>, that such sales shall be made for cash to the fullest extent practicable;

(ii)    incur such fees, costs and expenses for the account of the Company as may be reasonable and necessary or advisable to accomplish such liquidation;

(iii)    defer and withhold from liquidation Company assets if, in the best judgment of the Liquidation Representative, such action is in the best interests of Company's creditors and the Members; and

(iv)    take any and all other actions as may be permitted under the Act.

Pending the liquidation provided for herein, the Liquidation Representative shall have the power and authority to operate, manage and otherwise deal with the Company's Property and to pay or provide for payment and discharge of the Company's debts, obligations and liabilities, whether or not accrued, absolute, fixed or contingent.

(c)    <u>Distribution of Assets</u>.

(i)    Gain or loss realized upon the sale or exchange of Company assets pursuant to Section 15(b) shall be allocated to the Members' Capital Accounts in accordance with the provisions of Section 6.

(ii)    Prior to any distribution relating to liquidation of the Company, the Liquidation Representative shall also adjust each Member's Capital Account to reflect the manner in which the unrealized income, gain, loss and deduction inherent in the Company's Property (that has not been reflected in the Members' Capital Accounts previously) would be allocated among the Members if there were a taxable disposition of such Property for the fair market value of such Property (taking Code Section 7701(g) into account) on the date of distribution.

Final                                                                                              7/3/2003

(iii)    Distributions relating to liquidation may be made in cash or other property (or a combination thereof) and shall be made in the following order:

(A)    To the payment and discharge of all debts, liabilities and obligations of the Company to Company creditors (including Members in their capacity as creditors, if any) in the order of priority as provided by law;

(B)    To the establishment of any reserves for any contingent or unforeseen liabilities or obligations of the Company; provided, however, that if such reserves are established, the Capital Accounts of the Members shall be adjusted pursuant to Section 15(c)(i) and upon the determination that it is no longer necessary to maintain any particular portion of such reserves, such portion shall be immediately distributed in accordance with this Section 15(c)(iii); and,

(C)    To the Members, first, to the repayment of each Member's Capital Account on a pro rata basis, and, second, to the extent of, and in proportion to, the Percentage Interest of each Member.

(iv)    Upon the completion of the winding up of the affairs of the Company and the distribution of its assets as provided for herein and in the Act, the Members shall cause the Certificate to be canceled in accordance with the Act.

16.    <u>Action by and Meetings of the Members.</u>

(a)    <u>Action by the Members</u>. Except as otherwise stated herein, any vote, consent, approval, determination, election or agreement in regard to any action required of or permitted by Member by any provision of this Agreement or by law shall be effective if taken, given or made by a Majority in Interest of the Members and may be expressed as follows:

(i)    by the written consent of the Member at or prior to the time of the action for which the consent is intended;

(ii)    by the Member's failure to respond to a written request for consent sent by another Member to such Member, which failure to respond continues for at least thirty (30) days after the date upon which such request was received by such Member (which date shall be determined with reference to the date set forth in the return receipt with respect to the mailing of such request by the Member seeking such consent); or

(iii)    by the affirmative vote of the Member as to the action for which the vote is taken at any meeting which may be called and held to consider such action pursuant to Section 16(b).

(b)    <u>Meetings of Members.</u>

(i)       Any matter requiring the vote, consent, approval, determination, election or agreement of the Members pursuant to any Section of this Agreement or by law may be considered at a meeting held not fewer than five (5) days nor greater than sixty (60) days after written notice thereof shall have been given by any Member.

(ii)      Such meeting may be held at the principal office of the Company or may be held by means of conference telephone or similar methods of communication during which all persons participating may be heard simultaneously.

17.    <u>General.</u>

(a)    <u>Notices</u>.

(i)       Any notice, payment, demand, request, consent or other communication required or permitted to be given by any provision of this Agreement or by law shall be in writing and shall be deemed to have been delivered and given for all purposes, whether or not the same is actually received (except in the case of payments), if sent by registered or certified mail, return receipt requested, or by FedEx or similar overnight delivery service, in each case postage and charges prepaid.

(ii)      Notices sent to the Company shall be addressed as follows or to such other address or addresses as may be specified by written notice to the Members:

> Aegis Investment Partners, L.L.C.
> 4600 South Syracuse Street, Suite 1080
> Denver, Colorado 80237

(b)    <u>Assignment</u>.  This Amended Agreement will inure to the benefit of the parties and their respective successors and permitted assigns; <u>provided</u>, <u>however</u>, that any proposed assignment shall be subject to the transfer restrictions set forth in Section 12(a).

(c)    <u>No Other Consulting or Broker Agreements</u>.  Except for the Consulting Agreements attached hereto as <u>Exhibit I</u>, there are no other agreements or monies to be paid in connection with any of the transaction contemplated by this Amended Agreement.

(c)    <u>Amendment</u>.  This Amended Agreement may be amended in whole or in part with the written consent of the Majority-in-Interest.

(d)    <u>Section Headings</u>.  Section and other headings contained in this Agreement are for reference purposes only and are in no way intended to describe, interpret, define or limit the scope, extent or intent of this Agreement or any provision hereof.

(e)    <u>Severability</u>.  The provisions of this Agreement shall be deemed severable, and the invalidity or unenforceability of any provision shall not affect the validity or enforceability of the remainder of this Agreement or any valid clause of any invalid portion.

(f)    <u>Governing Law</u>.  This Agreement will be governed by, and construed and enforced in accordance with, the laws of the state of Delaware without regard to conflict of laws principles.

(g)    <u>Counterpart Execution</u>.  This Agreement may be executed in any number of counterparts with the same effect as if all parties hereto had signed the same document.  All counterparts shall be construed together and shall constitute one Agreement.  Delivery of an executed counterpart of this Agreement by telefacsimile shall be equally as effective as delivery of a manually executed counterpart of this Agreement.  Any party delivering an executed counterpart of this Agreement by telefacsimile shall also deliver a manually executed counterpart of this Agreement, but the failure to deliver a manually executed counterpart shall not affect the validity, enforceability or binding effect of this Agreement.

(h)    <u>Parties in Interest</u>.  Each and every covenant, term, provision and agreement herein contained shall be binding upon, and inure to the benefit of, the parties hereto and their respective permitted successors and assigns.

(i)    <u>Entire Agreement</u>.  This Agreement sets forth the entire understanding of the parties with respect to the subject matter covered hereby and supersedes all prior or contemporaneous agreements, arrangements or communications, whether oral or written.

(j)    <u>Section References</u>.  Except as otherwise specifically noted or required in the context, all references herein to Sections shall refer to Sections of this Agreement.

(l)    <u>Waivers</u>.  No failure by any party in exercising any right, power or privilege under this Agreement shall operate as a waiver thereof; nor shall any single or partial exercise of any right, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, power or privilege.